A11A1463. IN THE INTEREST OF D. W. et al., children.
A11A1464, A11A1465. WHITEHEAD et al. v. MYERS et al.
(two cases).
(716 SE2d 785)

BARNES, Presiding Judge.

These three companion appeals involve a custody dispute between the biological parents of the minor children D. W. and L. W. and the maternal grandparents. At the time of the dispute, the children, both of whom have special needs and are developmentally delayed, were in the temporary custody of the grandparents because the Department of Family and Children Services ("DFCS") had removed them from the parents' home. For the reasons discussed below, we affirm the superior court's decision to award permanent custody of the children to the grandparents. We likewise affirm the juvenile court's decision to deny the parents' motion for reunification with their children.

When reviewing child custody decisions, we view the evidence in the light most favorable to upholding the trial court's order. *Mitcham v. Spry*, 300 Ga. App. 386 (685 SE2d 374) (2009). So viewed, the evidence showed that D. W., a male child, was born on June 22, 2004, and L. W., a female child, was born on January 6, 2006. The biological parents' involvement with DFCS began in the summer of 2007 when L. W., who was approximately 17 months old, was admitted to Scottish Rite Hospital, where she tested positive for salmonella and was diagnosed with failure to thrive. At the time of her admission,

L. W. was in a severe lethargic state, "couldn't hold her head up even much to cry," was dehydrated, feverish, and had a dilated rectum with "string-mucus-looking stuff coming out of it." L. W. had a severe diaper rash "like skin was coming loose from her bottom," her ribs were visible, and her stomach was slightly bloated. Additionally, L. W. was not walking or talking, was not passing urine, and was not having normal bowel movements. Despite these signs of distress which had been present for over a week, L. W. was taken to the hospital only at the initiative of the grandmother; the parents thought that she simply had "a little bit of a bug or something" and had not sought medical treatment.

As a result of her condition, L. W. received intravenous feeding and was hospitalized for a week. Because L. W. clearly exhibited signs of medical neglect, one of the medical providers contacted Paulding County DFCS, which removed the children from the parents' care and placed them with the maternal grandparents in July 2007. The deprivation case was then transferred to Carroll County, as this was the home county of the parents at the time. Carroll County DFCS developed a family safety plan requiring the parents, among other things, to meet the medical and developmental needs of their children.

When DFCS became involved with the children, the older child D. W., who was then three years old, was unable to communicate verbally. In the fall of 2007, at the grandparents' initiative, the Paulding County School System evaluated D. W. through an "Arena Assessment," a comprehensive evaluation of his cognitive, speech, and motor functioning. Based upon the evaluation, D. W. was diagnosed with significant developmental delay and a speech-language impairment. Among other things, D. W. could not understand or follow simple verbal directions such as "clap your hands," could not initiate conversation, had a low vocabulary, and could not identify pictures of common objects. In light of the information obtained from D. W.'s Arena Assessment, the school system developed an Individual Education Program ("I. E. P.") for him that charted goals and objectives for his development, and D. W. was assigned to a Head Start special needs program for the 2007-2008 school year.

Beginning in August 2008, after the parents attended parenting classes and received instruction from a "family service worker," DFCS placed D. W. back with his parents on a trial basis. Although D. W. had an I. E. P. in place and had been enrolled in a Head Start special needs program in the 2007-2008 school year in Paulding County, the parents enrolled D. W. in the Carroll County School System for the 2008-2009 school year, told the school pre-kindergarten resource coordinator that he did not have any devel-

opmental delays or an I. E. P., and requested that he be placed in a mainstream pre-kindergarten classroom. Despite the parents' statements to the resource coordinator, D. W.'s teachers recognized that he had significant developmental delays and eventually learned from the grandparents of the existing 2007 I. E. P. reflecting his special needs.

During this same period, D. W. was injured twice while in his parents' care. Both injuries occurred when the mother was watching D. W. while the father was away at work. On the first occasion, D. W. fell against a table and "ended up with a gash in his back," and on the second occasion, teachers noticed that D. W. had a ligature mark around his neck. The parents offered no explanation for how D. W. sustained these injuries.

In light of the problems that had arisen, DFCS again removed D. W. from the parents' care in October 2008 and placed him back with the maternal grandparents. The grandparents re-enrolled D. W. in the Paulding County School System, where he began attending a special needs pre-kindergarten program under the I. E. P. that had been developed for him.

By the fall of 2008, DFCS also had become concerned that L. W. might suffer from autism. For example, L. W., who was then two years old, could not communicate, exhibited repetitive behaviors, such as twisting and hand flapping, would not respond to her name, and had difficulty eating, even when spoon-fed baby food. Several care providers recommended that an appointment be scheduled with the Marcus Autism Center to have L. W. screened for autism. The father repeatedly claimed that he was attempting to have an appointment scheduled for L. W. at the center but maintained that the center kept rescheduling it. Yet, when the grandfather drove to the center to learn why L. W.'s appointment purportedly had been rescheduled several times, the center had no file on her. At that point, the grandparents immediately took steps to have L. W. screened at the center.

Following these incidents, Carroll County DFCS filed a deprivation petition alleging that the parents could not provide adequate supervision or care for their children. The juvenile court adjudicated the children deprived, finding that "the children cannot be adequately and safely protected at home [and] the mother and father cannot meet the . . . special needs of the children." The court awarded temporary custody of the children to the maternal grandparents, with the deprivation order set to expire in February 2011.

Since the time of the deprivation order, the children have remained in the custody of the grandparents. While in her grandparents' care and at their initiative, L. W. has been treated at the feeding disorder clinic at the Marcus Autism Center, and she has

been involved in a special education program at the local elementary school under an I. E. P. developed to address her special needs. According to the licensed psychologist who worked with L. W. at the feeding disorder clinic and who was admitted as an expert in autism and feeding disorders, L. W. is in the moderate to severe range of the autism spectrum, exhibiting impairments in expressive communication and receptive comprehension, as well as fine motor deficits. L. W. does not communicate verbally, does not respond to direction, cannot feed herself with utensils, does not make eye contact, does not engage interactively with caregivers, and is not toilet trained. She also engages in repetitive behaviors, including jumping up and down and flapping and raising her hands, will not sit in a chair without someone "right with her," and will open doors and run off if not constantly supervised. According to the licensed psychologist, individuals such as L. W. who are in the moderate to severe range of the autism spectrum require adult supervision and assistance in "every aspect" of their daily lives.

While in his grandparents' care, D. W. also has continued to receive assistance at the local elementary school in accordance with his I. E. P. The special education teachers who have worked with D. W. testified that he began with significant developmental delay and speech-language problems but has progressed over time based upon the therapy and assistance he has received. D. W. now attends school in a mainstream first grade classroom, but he requires the continued assistance of a special education aide. He also continues to have several challenging behavioral issues, including the fact that he is "constantly questioning and demanding" and is "constantly bouncing."

The parents have continued to have visits with their children while they have been in the grandparents' care, but only in a supervised setting. However, during these visits, and while under her parents' purported supervision, L. W. has been observed running into a wall, climbing on a table, putting small objects in her mouth, and escaping from the visitation area. As a result, the visitation supervisors often had to intervene. One supervisor observed that L. W. "is constantly in motion and neither parent seems to keep up with her." During one visit, L. W. skinned her knee and both elbows after the parents let her run down a driveway, and during another visit, the parents lost L. W.'s special orthopaedic shoes and returned her to the grandparents barefoot. Additionally, a supervisor testified that the father simply mimics L. W.'s guttural noises "over and over and over" during visits. With regard to D. W., the parents were observed permitting him to run around inside with an open umbrella during one visit, and a supervisor testified that the mother often appears overwhelmed and frustrated by his high energy level.

In 2010, with the parents' consent, the deprivation case was transferred back to Paulding County, where the grandparents lived. In March 2010, the biological parents filed a motion for reunification in the Juvenile Court of Paulding County, alleging that they had completed all goals of their case plan and seeking to have their children returned to their custody. In May 2010, the grandparents filed a petition for permanent custody in the Superior Court of Paulding County, seeking permanent, sole physical and legal custody of the children.

Pursuant to OCGA § 15-11-30.1 (b),[1] the superior court transferred the grandparents' petition for permanent custody to the juvenile court. The juvenile court then heard both the parents' motion for reunification and the grandparents' petition for permanent custody in an evidentiary hearing conducted over three days in August 2010.

At the three-day hearing, the juvenile court heard from multiple witnesses who testified to the events as set out above, including the special education teachers and therapists who have worked with the children and the visitation supervisors who have overseen the parental visits. Among other things, two visitation supervisors and a therapist who counseled the parents also testified that the parents have stated that they do not think that L. W. has autism and believe that her delays are caused by "separation trauma" and by how the grandparents are raising and caring for her.

The mother testified at the hearing as well. She related that she and her husband now live in South Carolina and that she is alone each day from 8:00 p.m. until 8:00 a.m. while her husband works night shift, after which he returns home to sleep. According to the mother, she would be watching the children alone during the day if she and the father regained custody. She conceded that she was "not sure" how she would be able to care for both children by herself while her husband was away at work or sleeping in preparation for work.

The mother further testified she has never been shown any documentation reflecting that L. W. is autistic and that, as a result, she would want L. W. fully re-evaluated if the children were returned to her. With regard to D. W., the mother testified that she was not aware that he has any special needs, although "he might be a little

---

[1] OCGA § 15-11-30.1 (b) provides in part:

Other courts, in handling divorce, alimony, habeas corpus, or other cases involving the custody of a child or children, may transfer the question of the determination of custody, support, or custody and support to the juvenile court for investigation and a report back to the superior court or for investigation and determination. . . .

behind a bit." However, the mother admitted that she had never met or directly communicated with any of L. W.'s doctors to discuss her diagnosis and had never met with the children's special education teachers or therapists to learn about their developmental issues.

The father likewise took the stand. He testified that he does not know if L. W. has autism, that he believes that she might be able to outgrow her condition, and that he believes that the grandparents have caused L. W.'s condition due to a lack of sufficient interaction with her. As a result, the father stated that he would want L. W. completely re-evaluated if he regained custody. He further testified that he does not know if D. W. needs an I. E. P., and when asked whether he believes that there is anything wrong with D. W.'s development, he responded only that D. W. "might be suffering a little bit from the stress that's been generated . . . by this entire situation." The father conceded that he has not spoken directly with the children's physicians, therapists, or teachers about their developmental issues.[2]

The grandmother, a former teacher in Paulding County, also testified at the hearing. She testified that both she and her husband are now retired, and that she generally supervises L. W. while her husband supervises D. W. when the children are at home with them. The grandmother further testified about the various therapies and programs she had obtained for the children to address their special needs, including Babies Can't Wait, occupational therapy, speech therapy, and feeding therapy at the Marcus Autism Center for L. W., and Head Start, speech therapy, and special education services for D. W. Other care providers confirmed that the grandparents were actively involved in the children's care and treatment.

The grandmother also testified that her daughter, the children's mother, had confided in her that "she did not know what she would do" if she regained custody and had to take care of the children. When asked about what the father had verbalized to her about the children's special needs, the grandmother responded, "He doesn't see anything the matter. I mentioned to him before any of this ever came about that we thought that the kids had delays and . . . weren't meeting their maturity mileposts, and he didn't see a problem with it."

---

[2] While the father made the general claim that none of the teachers or other providers would talk to him because he did not have custody of his children, he was unable to name any specific individuals who said that to him. Indeed, several care providers testified that they had not been contacted by the parents but would have been willing to speak with them. Moreover, the father conceded that he never raised this issue with the grandparents or inquired from his children's guardian ad litem, his counsel, or the juvenile court in the deprivation case about speaking with his children's teachers or other providers.

Additionally, the guardian ad litem for the children testified at the hearing. She stated that the grandparents were very dedicated to the children, were able to handle them very well, and had a home suitable for them to live in. In contrast, she testified that while the parents clearly loved their children, she had significant doubts as to whether they could care for the children in an unsupervised setting "for even an afternoon" in light of her observation of a supervised visitation between the parents and children. A therapist who had conducted sessions with the parents similarly opined that she would not be comfortable with the mother being left alone with or attempting to take care of two special needs children.

After hearing from all of the witnesses, the juvenile court entered a 35-page order in September 2010 containing detailed findings of fact and conclusions of law. The juvenile court found that there was clear and convincing evidence that the parents were not fit to care for the children due to their lack of understanding of the children's special needs and their inability to meet those needs. For the same reasons, the juvenile court found that parental custody would harm the children. In addition, the juvenile court found that the grandparents had rebutted the presumption in favor of the parents and that an award of custody to the grandparents would best promote the children's health, welfare, and happiness. Accordingly, the juvenile court denied the parents' motion for reunification.

With regard to the grandparents' motion for permanent custody, the juvenile court recommended that it be granted, but transferred the permanent custody matter back to the superior court "to determine whether to adopt the findings of the [j]uvenile court" and for entry of a "final order" on the disposition of custody. See OCGA § 15-11-30.1 (b); Uniform Juvenile Court Rule 5.2.

After receiving the juvenile court's recommendations, the superior court entered an order in October 2010 granting the grandparents' petition for permanent custody. The superior court stated that it was adopting the juvenile court's findings of fact; ordered the parents to pay monthly child support; and granted the parents supervised visitation with the children on a weekly basis. In a subsequent order entered in November 2010, the superior court reiterated that it was incorporating by reference the juvenile court's September 2010 order as its own.

1. The parents contend that the superior court erred by adopting the juvenile court's recommendations and entering an order that granted permanent custody of the children to the grandparents and only limited visitation to them. We disagree.

Custody disputes between a biological parent and . . . third-party relative[s], in this case [the maternal grandpar-

ents], are directly controlled by OCGA § 19-7-1 (b.1). That statute establishes a rebuttable presumption that it is in the best interest of the child to award custody to the parent of the child. The following three presumptions are implicit in the statute: (1) the parent is a fit person entitled to custody, (2) a fit parent acts in the best interest of his or her child, and (3) the child's best interest is to be in the custody of a parent. The presumption can nonetheless be overcome by the third-party relative showing, by clear and convincing evidence, that parental custody would harm the child. Harm in this context has been defined . . . as either physical harm or significant, long-term emotional harm, not merely social or economic disadvantages. Once the presumption has been overcome, the third-party relative must prove that an award of custody to him or her will best promote the child's health, welfare, and happiness.

(Citations and punctuation omitted.) *Galtieri v. O'Dell*, 295 Ga. App. 797, 798 (673 SE2d 300) (2009). See *Clark v. Wade*, 273 Ga. 587, 589-599 (II)-(V) (544 SE2d 99) (2001) (plurality opinion); *Burke v. King*, 254 Ga. App. 351, 352-353 (562 SE2d 271) (2002).

The grandparents clearly met their burden in this case. There was evidence presented at the hearing, as previously discussed, reflecting that L. W. is in the moderate to severe range of the autism spectrum, exhibiting severe impairments that require her to be constantly supervised and assisted throughout the day. There also was evidence that D. W. continues to suffer from developmental and speech-language impairments and has behavioral problems that can make him difficult to manage. Thus, the evidence, when construed in the grandparents' favor, amply demonstrated that both children have special needs that can only be addressed by a highly attentive primary caregiver.

At the same time, there was evidence from which the superior court could find that the parents have consistently failed to attend to their children's special needs and physical well-being. At the time of their initial removal from the parents' home, L. W. was physically emaciated and infected with salmonella, and D. W. was severely developmentally delayed. Nevertheless, the parents had not obtained treatment or assistance for their children at that point. Later, when D. W. was returned to the parents on a trial basis, he was physically injured under their care, and the parents simply ignored his special needs when enrolling him in school that fall. Furthermore, even during continued supervised visitations with their children, the parents failed to adequately supervise them, leading to L. W. being physically injured on several separate occasions and to D. W. engag-

ing in dangerous behavior.

Additionally, there was evidence, including the parents' own testimony, reflecting that they have consistently downplayed and ignored the severity of their children's special needs. In this regard, both parents indicated that they were unwilling to accept at this point that L. W. has autism, despite her thorough evaluation by the Marcus Autism Center, and both minimized the significance of D. W.'s developmental delays and speech-language impairment. Moreover, there was evidence that the parents had made no real effort to become fully informed about their children's conditions by communicating with the physicians, therapists, and teachers who have worked with and treated them over the past several years.

Furthermore, the guardian ad litem for the children and the therapist who had conducted sessions with the parents communicated their grave concerns about the parents being able to take care of the children on their own. Indeed, the mother herself communicated to the grandmother her own doubts about handling the children alone during the day.

In light of this record, the superior court was authorized to find that there was clear and convincing evidence that parental custody would harm the children, thereby overcoming the presumption that it would be in the best interest of the children to award custody to their parents. In turn, the superior court was authorized to find that an award of custody to the grandparents would best promote the children's health, welfare, and happiness, given the evidence that the grandparents had served as the children's primary caregivers for several years, were fully cognizant of the children's special needs, were actively involved in securing services and therapies for the children and charting their progress, and were in a position due to their retirement to carefully monitor the children on a daily basis.

Accordingly, we conclude that the superior court did not err in granting permanent custody to the grandparents with limited visitation to the parents. See *Clark*, 273 Ga. at 598-599 (IV) (noting that in considering the issues of harm and custody, courts should consider several factors, including whether the children "have unique medical or psychological needs that one party is better able to meet"); *Triplett v. Elder*, 234 Ga. 243, 244 (215 SE2d 247) (1975) (taking into account that younger child was mentally retarded and enrolled in a special needs educational program in denying custody to biological mother); *Williams v. Ferrell*, 231 Ga. 470 (202 SE2d 427) (1973) (taking into account that child suffered from acute leukemia and was currently receiving good medical treatment in denying custody to biological mother). While the parents presented evidence aimed at showing that they were fully prepared and competent to handle their children's special needs, it was for the superior court, not this court,

to resolve the conflicts in the testimony. See *Haskell v. Haskell*, 286 Ga. 112 (1) (686 SE2d 102) (2009) ("It is the duty of the trial judge to resolve the conflicts in the evidence.") (citation and punctuation omitted).

2. The parents further contend that the juvenile court erred in recommending to the superior court that permanent custody of the children be granted to the grandparents. However, once the superior court adopted the juvenile court's findings of fact and custody recommendations as its own, the juvenile court's interim order was rendered moot and will not be considered separately on appeal. See *Flowers v. Robinson*, 157 Ga. App. 471, 472 (1) (a) (278 SE2d 38) (1981).

3. The parents further contend that the juvenile court erred in denying their motion for reunification with their children in the deprivation case. We are unpersuaded.

> Regardless of nomenclature, the [parents'] motion for the return of custody of [their children] sought to modify or vacate the unexpired deprivation order based upon an alleged change in circumstances. Under OCGA § 15-11-40 (b), "(a)n order of the (juvenile) court may . . . be changed, modified, or vacated on the ground that changed circumstances so require in the best interest of the child." The burden is on the movant to prove by a preponderance of the evidence that due to changed circumstances, it was in the best interests of the child that the requested modification or vacation of the prior order be granted. We review a juvenile court's ruling on whether the movant met his or her burden only for an abuse of discretion. There can be no abuse of discretion if there was any evidence to support the ruling of the juvenile court.

(Citations and punctuation omitted.) *In the Interest of J. N. F.*, 306 Ga. App. 313, 315 (701 SE2d 925) (2010). Here, based upon the same evidence discussed in Division 1, the juvenile court did not abuse its discretion in denying the parents' motion.

*Judgments affirmed. Adams and Blackwell, JJ., concur.*

DECIDED SEPTEMBER 15, 2011.

*Jana L. Evans*, for appellants.
*Diane M. Sternlieb*, for appellees.